IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ANDREA SZEBENI,

    Plaintiff,

v.

FAIRHAVEN HOLDINGS, LLC d/b/a
FAIRHAVEN TREATMENT CENTER,
And REFRESH MENTAL HEALTH, INC.

    Defendants.

Case No.: _____
JURY DEMANDED

## COMPLAINT

COMES NOW Plaintiff Andrea Szebeni. ("Plaintiff" or "Ms. Szebeni") and submits her Complaint against Fairhaven Holdings, LLC d/b/a/ Fairhaven Treatment Center, and Refresh Mental Health, LLC and would show to the Court as follows:

### I. PARTIES

1. Plaintiff is currently residing at 10 Brook Lane, Berlin, Massachusetts 01503.

2. Defendant Fairhaven Holdings, LLC d/b/a Fairhaven Treatment Center ("Defendant Fairhaven") is a Tennessee Limited Liability Company doing business in Shelby County Tennessee with a principal place of business located at 671 N. Ericson Road, Cordova, Tennessee 38018. Defendant Fairhaven may be served with process upon its Registered Agent CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

3. Defendant Refresh Mental Health ("Defendant Refresh") is a Delaware Corporation. Defendant Refresh's principal place of business is located at The Metropolitan Building, 301 1st Street North, Suite 712, Jacksonville Beach, Florida 32250. Defendant Refresh

may be served with process upon its Registered Agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Defendant Refresh is the successor and assign of Defendant Fairhaven, and is liable for the conduct of its predecessor Fairhaven.

## II. JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction over this lawsuit under the provisions of 28 U.S.C. § 1332. Plaintiff Ms. Szebeni, Defendant Fairhaven, and Defendant Refresh are citizens of different states.

5. Complete diversity of citizenship exists inasmuch as Ms. Szebeni is a citizen of Massachusetts, while Defendant Fairhaven is a citizen of Tennessee, and Defendant Refresh is a citizen of Delaware and of Florida.

6. The amount in controversy is in excess of $75,000 exclusive of interest and costs.

## III. FACTS

7. Prior to March 2018, Ms. Szebeni was a resident of Palm Beach, Florida for sixteen (16) years where she owned a consulting business called Body Dynamics Nutrition.

8. Defendant Fairhaven is a residential facility and outpatient facility which provides treatment for individuals with eating disorders.

9. In March 2018, Defendant Fairhaven contacted Ms. Szebeni at a time when she was employed and domiciled in the State of Florida, through LinkedIn regarding interviewing for employment with Defendant Fairhaven in the position of Clinical Operations Director at Defendant Fairhaven's facility in Cordova, Tennessee. Ms. Szebeni was interviewed and subsequently offered the position.

10. At the time of her interview, Defendant Fairhaven told Ms. Szebeni that they were a privately held organization and not a part of a big corporation. This was a major enticement to Ms. Szebeni who, at that time, owned her own business and had no desire to work for a major corporation. Further, Defendant Fairhaven told Ms. Szebeni that she would be allowed to work from home whenever she needed to.

11. Ms. Szebeni and Defendant Fairhaven entered into an Employment Agreement (the "Employment Agreement") dated March 28, 2018 which stated in part as follows:

> 1. <u>Employment and Term</u>. Employer hereby employs Employee and Employee hereby accepts employment upon the terms hereinafter set forth in this agreement. The employment under this Agreement shall commence on or about April 21, 2018, and shall be at-will provided that the terminating party complies with the termination provisions of Section 10.
>
> 2. <u>Duties and Extent of Service of Employee.</u>
>
> (a) Employee shall serve as the Clinical Operations Director of Employer and shall have all of the duties and responsibilities as set forth in the Employer's position description attached hereto as Exhibit B (the "Duties"). In addition, and without further compensation, the Employee may serve as a director and/or officer of one or more of the Employer's Affiliates if so elected or appointed from time to time. Employee shall not during the term of this Agreement be engaged in any other business activity, whether or not such business activity is pursued for gain, profit, or other pecuniary advantage which interferes with Employee's full time employment by Employer without the express written consent of Employer, but this shall not be construed as preventing Employee from investing Employee's assets in such form and manner as does not interfere with Employee's full time service to Employer.
>
> …
>
> 3. <u>Compensation/Benefits.</u>
>
> (a) For all services rendered by Employee under this Agreement, Employee shall be entitled to such compensation and benefits as set forth in Exhibit A, attached hereto.
>
> …
>
> 9. <u>Termination for Cause.</u> Employee may be terminated for cause upon ten (10) days prior written notice stating the effective date of such termination and the reason therefor. For purposes of this paragraph "cause" includes, shall mean the following:

    (a)    Employee's censure or probation resulting from disciplinary hearings before the Tennessee Board of Mental Health;

    (b)    Employee being charged or a conviction of Employee for a felony or of any crime involving moral turpitude;

    (c)    failure to adhere to professional and ethical standards imposed by local, state or national mental health professional societies;

    (d)    gross or willful misconduct of Employee, or Employee's neglect, failure or refusal to perform or observe any or all of his obligations hereunder at all times and in the manner provided herein; provided, in the event of failure to perform and meet all obligations hereunder, which failure is not the result of willful misconduct or gross negligence, such failure must continue for seven (7) days following notice by Employer to Employee;

    (e)    acts of dishonesty by Employee towards Employer;

    (f)    Employee is adjudicated as being legally incompetent by any court having jurisdiction to determine such matter;

    (g)    the inability of Employer to maintain liability insurance coverage for acts of Employee;

    (h)    substance abuse by Employee which includes Employee's drunkenness and/or drug addiction, which Employer, in its discretion, determines interferes with or threatens patient care or safety;

    (i)    any act or conduct by Employee which constitutes "cause for termination" under Tennessee law;

    (j)    Employee becomes non-eligible for malpractice insurance; or

    (k)    the failure by Employee to conform to and comply with Employer's reasonable professional requirements concerning maintenance of Employer records, which failure continues for ten (10) days following notice to Employee.

…

    17.    <u>Attorneys' Fees</u>.  Should any litigation be commenced between the parties hereto or their representatives concerning any provisions of this Agreement or the rights and duties of any person or entity hereunder, the party or parties prevailing in such proceeding will be entitled to reasonable attorneys' fees and expenses of counsel and court costs incurred by reason of such litigation.

…

Exhibit A of Employment Agreement

1. **Base Annual Salary** $110,000 paid on bi-weekly increments.

2. **Annual Bonus** $10,000 potential based on performance (pro-rated for 2018 based on start date).

3. **Relocation Bonus** $5,000 paid within 30 days of start date (Relocation bonus to be repaid in its entirety in the event that employee is separated from employment within 1 year of start date).

4. Ability to participate in any group Healthcare, Dental, Vision plans that may be offered by Employer.

5. Ability to participate in any 401k plan established by Employer after satisfying vesting period and other participating requirements.

6. Eighteen days paid time off annually (January-December), accrual based on hours worked.

A copy of the Employment Agreement is attached hereto as Exhibit 1.

12. The Employment Agreement also provided a Job Description for the position of Clinical Operations Developer. *See* Exhibit B to the Employment Agreement.

13. Based upon the offer of employment, the Employment Agreement, the compensation package, the Job Description and the promises and representations made by Defendant Fairhaven, Ms. Szebeni closed her business in Palm Beach, Florida, relocated to Memphis, Tennessee on April 24, 2018, and began working for Defendants on or about May 7, 2018.

14. After moving to Memphis and beginning her employment with Defendant Fairhaven, Ms. Szebeni was informed that Defendant Fairhaven had been purchased and/or merged with Defendant Refresh based out of Jacksonville, Florida. Defendant Fairhaven had knowledge of this pending acquisition at the time it contracted with and made employment representations to Ms. Szebeni and intentionally and fraudulently concealed this information.

15. Further, after moving to Memphis and beginning her employment with Defendant Fairhaven, Ms. Szebeni's job duties were not as those called for under the Job Description which was attached as Exhibit B to the Employment Agreement. Fairhaven was constantly changing what it expected of Ms. Szebeni in her role as Clinical Operations Director. By way of example:

   a. Her original job description said she would be the direct supervisor of all Operations Managers and operations support personnel; however, this was not the case. Ms. Szebeni was only allowed to manage the dietitians, the kitchen staff, and a nurse.

   b. Ms. Szebeni's job description did not include the responsibility to lead nutrition groups except as needed. Ms. Sezbeni was never told that she was needed to lead nutrition groups.

   c. Ms. Szebeni's job description stated that "Teri" would be Ms. Szebeni's direct supervisor since Ms. Szebeni would work with her on a clinical basis. After she began her employment she was told that Mr. McCann was her supervisor.

   d. Ms. Szebeni's job description significantly changed on a weekly basis in the months of June, July, August and September 2018. Ms. Szebeni requested a written updated job description but none was ever provided.

   e. Ms. Szebeni was told she would be in charge of the CARF accreditation. Every week her role in the CARF accreditation was changed.

16. Ms. Szebeni spoke with HR Director Shaun Bone regarding all the changes in her job description and Ms. Bone informed her that she could not change anything unless Mr. McCann told her to. When Ms. Szebeni spoke with Mr. McCann, he told her that the company was in such a transition because of the acquisition that the changes would continue and for her not to worry about anything.

17. During her employment with Defendant Fairhaven, Ms. Szebeni discovered that Defendant Fairhaven was engaging in unlawful conduct, including but not limited to, drawing patient blood in the pantry closet next to the facility's kitchen, then carrying that human blood through the kitchen. Ms. Szebeni complained about this unsanitary condition on numerous occasions. In response, Defendant Fairhaven told Ms. Szebeni that they had to draw the blood in an area with a sink and that the kitchen was the only area with a sink.

18. Further, one of the nurses (Natalie Ragland, RN, BSN, CYT, CPT) was doing therapy. Ms. Ragland is a nurse and a yoga instructor, not a therapist. Ms. Szebeni asked questions and/or complained about Nurse Raglan conducting therapy on Fairhaven's patients. Ms. Szebeni was told that Teri "signed off" on all Ms. Ragland's notes. This was not legal.

19. As part of Ms. Szebeni's employment as called for under the Employment Agreement, Ms. Szebeni was supposed to be provided with certain benefits which included health insurance. The health insurance was to be effective as of May 7, 2018. Although Defendants deducted premiums from Ms. Szebeni's paycheck, Ms. Szebeni learned in July 2018 that the insurance had never been put in place. Ms. Szebeni complained because this was a material breach of her Employment Agreement. Despite her complaints, the insurance was not put in place until September 2018.

20. Ms. Szebeni became seriously ill in September 2018, with what turned out to be viral pneumonia. Ms. Szebeni worked from home during the time she was off work.

21. During her leave, Ms. Szebeni was informed for the first time that she was no longer permitted to work from home during her medical leave. Ms. Szebeni was told that she would have to take PTO for the time she was out for medical leave despite the fact that she had worked during her medical leave.

22. After the date Ms. Szebeni was told that she had to take PTO for her medical leave, she did not perform any work from home.

23. On Thursday, September 27, 2018, Ms. Szebeni was terminated from employment with Defendants.

24. At the time she was terminated, Ms. Szebeni was initially told that she was terminated allegedly for failure to write four (4) notes for insurance, which Defendant Fairhaven represented were two (2) weeks late. Ms. Szebeni explained that the notes that were not written were regarding patients who refused to see her. Since the patient had not been seen, Ms. Szebeni had no notes to write. Defendant Fairhaven stated that Ms. Szebeni should have written that "client refused to see dietician." Defendant Fairhaven never provided Ms. Szebeni with the seven (7) days' notice of the alleged failure to perform as required under Section 9(d) of the Employment Agreement. Further, Gina Griffith, who is a therapist at Fairhaven, did not write any notes from February 2018 to August 2018 resulting in over 60 missing notes. Ms. Griffith was not terminated. Instead, she was written up and went from a full-time employee to an hourly employee.

25. At the time she initially was informed of the termination, Ms. Szebeni was provided with a Separation Agreement and General Release (the "Separation Agreement"). Defendant Fairhaven initially did not allege that Ms. Szebeni's termination was for cause under Section 9 of the Employment Agreement. The Separation Agreement provided in part as follows:

> SEPARATION AGREEMENT AND GENERAL RELEASE
>
> Dear Employee:
>
> This letter will constitute the agreement between you and Fairhaven Treatment Center ("the Company") on the terms of your separation from the Company ("the Agreement"). The purpose of this Agreement is to terminate your

8

employment relationship on an amicable basis, to release the Company from all legally waivable claims, and to permit you to receive severance pay and related benefits.

By signing this Agreement, you will be giving up valuable legal rights. For this reason, it is very important that you carefully review and understand the Agreement before signing it. The deadline for accepting this Agreement is twenty-one (21) days from the date of receipt of this document. If you do not sign and return this document within the twenty-one (21) day period, this offer of severance and benefits will expire. The Company encourages you to take advantage of this period of time by consulting with a lawyer before signing the document.

In order to effect the termination of your employment and to provide you with certain benefits that you would not otherwise be entitled to, you and the Company agree as follows:

1. Your termination from employment with the Company is effective as of October 26, 2018 (the "Termination Date"). Your last day of work on-site at the Company is September 27, 2018.

2. You acknowledge and agree that even if you do not sign this Agreement, the Company will pay you the compensation that you have earned through the Termination Date. Similarly, even if you do not sign this Agreement, you will be offered benefits to which you are entitled under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and retain all benefits under the Company's 401(k) Plan. You are not eligible to participate in the Company's Annual Incentive Plan.

3. You acknowledge and agree that in addition to the compensation and benefits described in paragraph 2, the Company will pay you a severance amount in the amount of $8,461.54 (equivalent to 4 weeks of base salary compensation) plus all accrued but unused PTO at an hourly rate of $52.88 as a "Termination Benefit," to be paid after the signing of this Agreement and after the revocation period described in Paragraph 7 has expired. The Termination Benefit will be paid in accordance with the Company's normal payroll process, less applicable federal, state and/or local withholding and/or payroll taxes.

4. You acknowledge and agree that in addition to the compensation and benefits described in Paragraphs 2 and 3, you will not be required to repay the "Relocation Bonus" you received pursuant to your "Offer of Employment" dated March 21, 2018.

5. The Company agrees to provide a neutral reference to prospective employers confirming y our position, dates of employment and salary. You may inform prospective employers that you voluntarily resigned from your position with the Company.

9

  6. You acknowledge and agree that the Termination Benefit and other consideration and benefits described in Paragraphs 2-5 above exceed what you are otherwise entitled to receive on separation from employment, and that this consideration is in exchange for executing this Agreement and the general release contained in it.  You further acknowledge that you are not entitled to any payment or consideration not specifically referenced in this Agreement.

…

  9. You understand that you have 21 days from the date of this Letter in which to review and consider this Agreement and/or to consult with an attorney regarding the terms and effective of this Agreement.  The 21-day review period will not be affected or extended by any revisions, whether material or immaterial, that might be made to this Agreement.

  10. Further, you understand that you have 7 days after signing this Agreement to revoke the Agreement, and the Agreement will not be effective until that revocation period has expired.  In order to revoke the Agreement you must provide written notice to Shaun Bone, Business Director, by mail, email or hand-delivery.  Such notice must be received by the Company no later than the seventh day.  The Agreement will not become effective or enforceable, and no payments will be made, until this revocation period has expired without being exercised.

…

  16. This Agreement sets forth the complete and sole agreement between the parties regarding the subject matter addressed in this document and supersedes any and all other agreements or understandings, whether oral or written, regarding the subject matter addressed in this document.

…

  17. This Agreement and any claims arising out of this Agreement will be governed by and construed in accordance with the laws of the State of Tennessee.  Any claims or legal actions by one party against the other will be commenced and maintained in state or federal court located in the Western District of Tennessee, and you submit to the jurisdiction and venue of any such court.

…

If this letter correctly states the agreement and understanding we have reached, please indicate your acceptance by countersigning the provided copy and returning it to me.

         Very truly yours,

         Tom McCann

A copy of the Separation Agreement is attached hereto as Exhibit 2.

26. In addition to the Separation Agreement, Defendant Fairhaven provided conflicting reasons for Ms. Szebeni's employment separation. Defendant Fairhaven submitted a Tennessee Department of Labor and Workforce Development Separation Notice (the "Separation Notice") which indicated she was "discharged" as the reason for separation, but also indicated "resignation in lieu of termination." Further, the Separation Notice falsely stated that Ms. Szebeni received "Severance Pay in the amount of $8,451.54" for the period of October 28, 2018 to November 24, 2018. The Separation Notice was signed by Thomas McCann, Executive Director ("Mr. McCann"), and dated September 27, 2018. A copy of the Separation Notice is attached hereto as Exhibit 3.

27. On September 28, 2018, Ms. Szebeni signed the Separation Agreement and returned it to Defendants via U.S. Mail.

28. However, on October 2, 2018 at 4:49 p.m., Ms. Szebeni received an email from Mr. McCann unilaterally revoking the Separation Agreement providing yet another false reason for her employment separation, stating as follows:

> Andrea, it has come to Fairhaven's attention that you were conducting unauthorized research using Fairhaven clients and Fairhaven resources. In light of this new information, I am notifying you that the previous terms of separation under consideration are revoked and your employment is terminated for cause effective immediately.
>
> You will be receiving signed documents via Fedex tomorrow delivered to your home address. This information is also included as an attachment.
>
> Please direct any further inquiries or issues to Venus Sala, VP Human Resources.

A copy of the October 2, 2018 email is attached hereto as Exhibit 4. Significantly, Defendant Fairhaven failed to provide ten (10) days' prior written notice of the alleged termination for cause as required under Section 9 of the Employment Agreement. Defendant Fairhaven revoked the Separation Agreement and did not pay the consideration set forth therein and thus Ms.

Szebeni is not bound by the waiver and release in light of Defendant Fairhaven's revocation. Further, Ms. Szebeni hereby revokes the Separation Agreement based upon Defendants' prior revocation and refusal to perform.

29. As stated in Mr. McCann's email, the following day, Ms. Szebeni received documents from Fairhaven which included correspondence from Mr. McCann and an invoice for $5,000 for the relocation bonus Ms. Szebeni had been given when she moved from Palm Beach, Florida to Memphis, Tennessee. The letter provided even more additional false reasons for the termination and stated as follows:

> Date: 10/2/2018
> To: Andrea Szebeni
> Subject: Termination of Employment Effective 10/2/2018
>
> Ms. Szebeni:
>
> This notice is to inform you of the decision to terminate your employment effective immediately due to multiple professional and ethical violations on your part while employed at Fairhaven:
>
> - Significant gaps in timely documentation in accordance with Fairhaven Policy and Procedure
>
> - Incomplete or inappropriate documentation for clients dating back to May 2018
>
> - Unauthorized research project conducted on Fairhaven clients without Investigational Review Board approval, Fairhaven management knowledge or approval, client informed consent
>
> - Unauthorized use of Fairhaven resources to conduct personal business. Specifically, use of Fairhaven-funded graduate assistant and Fairhaven nutrition team to conduct unauthorized client research for dissertation
>
> Due to these egregious violations and clear pattern of disregard for professional standards, the severance package offered to you on 9/27/18 is revoked. Per contractual agreement you will also be required to reimburse the $5000 relocation bonus.

>Please refer any questions or future communications to Venus Salak at vsalak@refreshmh.com
>
>Thomas McCann
>Executive Director
>Fairhaven Treatment Center
>
>Cc:     Venus Salak

A copy of the letter and the invoice in the amount of $5,000 is attached hereto as Exhibit 5. Again, Defendant Fairhaven failed to provide ten (10) days' prior written notice of the termination for cause allegations as required by Section 9 of the Employment Agreement.

30. Ms. Szebeni was shocked when she read the email and the letter and discovered that Defendant Fairhaven was now falsely accusing her of conducting research on Fairhaven clients. While it is true that Ms. Szebeni is working on her doctoral dissertation, she has not conducted any research on any of Defendant Fairhaven's patients.

31. Part of Ms. Szebeni's job at Fairhaven was to assess and make changes to the nutrition department. Prior to hiring Ms. Szebeni, Defendant Fairhaven had a significant amount of turnover among its dieticians. In July 2018, Ms. Szebeni began revamping everything from the way the chefs prepared the food, the food provided and the way that they would be incorporating the food into the patient's diets.

32. As part of this revamping program, Ms. Szebeni prepared a questionnaire so that she could assess whether the patients were improving. Ms. Szebeni collected the questionnaires from the dieticians. Ms. Szebeni believed that it would make the patients feel better to see how they were progressing toward getting better. Ms. Szebeni compiled and used this information <u>only</u> in connection with the treatment of Defendant Fairhaven's patients. She did not use the information at any time for purposes of research or her dissertation. Further, she had no

intention of using the statistical information contained in the questionnaires for any purpose other than the care of Defendant Fairhaven's patients.

33. Defendant Fairhaven did have a graduate assistant in its facility who worked in the office with Ms. Szebeni. In the course of conversations, the graduate student made the comment that she was working on a Master's thesis. At that same time, Ms. Szebeni mentioned that she was working on her own dissertation. However, this conversation was related to their own education and had nothing to do with Fairhaven, its resources or its patients.

34. The allegations contained in the October 2, 2018 email and letter from Mr. McCann are fabricated and are merely an excuse to unlawfully terminate Ms. Szebeni's Employment Agreement and further, to unlawfully refuse to pay Ms. Szebeni the amounts she is due.

V.  CAUSES OF ACTION

COUNT I
BREACH OF CONTRACT
(Breach of the Employment Agreement)

35. The preceding paragraphs of the Complaint are hereby re-alleged as if fully set forth herein.

36. Ms. Szebeni is a party to an Employment Agreement with Defendant Fairhaven at the annual salary of $110,000. Defendant Refresh is the successor of Defendant Fairhaven and is an assignee of the Employment Agreement.

37. Ms. Szebeni has fully complied with any and all obligations and duties under the Employment Agreement.

38. Ms. Szebeni was not employed "at will" because Defendants failed to comply with the termination provisions set forth in Section 10 of the Employment Agreement, which incorporates the Section 9 "for cause" termination provisions of the Employment Agreement. Defendant Fairhaven failed to provide ten (10) days prior written notice of the alleged for cause termination. Thus, Ms. Szebeni was not an "at-will" employee.

39. Defendants breached the Employment Agreement by: (1) terminating Ms. Szebeni's employment allegedly for cause without providing her with ten (10) days notice as called for under Paragraph 10 and Paragraph 9 of the Employment Contract; (2) failing to provide Ms. Szebeni with health insurance upon commencement of her employment and for several months thereafter; (3) failing to pay Ms. Szebeni the amounts called for under the terms of the Employment Contract, including salary, vacation pay and bonuses.

40. Ms. Szebeni has been damaged as a result of the breach and prays for the following relief:

(a) For an award of damages in an amount to be proven at trial, but in any event, in excess of $1,000,000.

(b) For an award of costs and attorneys' fees expended herein pursuant to the Employment Agreement and for such further relief as this Court deems just and equitable.

COUNT II
FALSE AND DECEPTIVE REPRESENTATIONS IN PROCURING MS. SZEBENI'S EMPLOYMENT IN VIOLATION OF T.C.A. § 50-1-102

41. The preceding paragraphs of the Complaint are hereby re-alleged as if fully set forth herein.

42. By false and deceptive representations, Defendant Fairhaven influenced, persuaded and engaged Ms. Szebeni to close her business in Palm Beach, Florida and accept employment with Defendant Fairhaven in Memphis, Tennessee.

43. Defendant Fairhaven made false and deceptive promises to Ms. Szebeni concerning the pay, working conditions, job duties, compensation, the kind and character of the work, and her terms and conditions of employment with Defendant Fairhaven.

44. Defendant Fairhaven falsely and deceptively promised and represented to Ms. Szebeni that she would be paid a $110,000 salary, that the working environment would be in compliance with all legal requirements, that she would be provided with health insurance coverage, that she would be allowed to work from home whenever she needed to, that she would be able to use PTO when she worked from home during her serious illness, that she had a defined job description with Defendant Fairhaven, and that Defendant Fairhaven was not in the midst of a sale to the national company Defendant Refresh.

45. Ms. Szebeni relied upon the promises and representations made by Defendant Fairhaven, and Ms. Szebeni closed her business and place of employment in Florida, changed her position and moved from the State of Florida to Memphis, Tennessee to take a position with Defendant Fairhaven.

46. Defendant Fairhaven knew or should have known that Ms. Szebeni's reliance upon Defendant Fairhaven's promises and representations would persuade Ms. Szebeni to change her position and move to Memphis, Tennessee to take a position with Defendant Fairhaven.

47.     Defendant Fairhaven intentionally deceived Ms. Szebeni into believing that she would have certain salary, benefits, job duties, working conditions and that she would work in a lawful and sanitary environment.

48.     Ms. Szebeni has been damaged as a result of Defendant Fairhaven's false and deceptive promises and representations.

49.     Ms. Szebeni prays for judgment in her favor against Defendants for all actual damages sustained to be proven at trial, but in any event in excess of $1,000,000 plus all reasonable attorneys' fees incurred by Ms. Szebeni pursuant to T.C.A. § 50-1-102(2).

COUNT III<br>NEGLIGENT MISREPRESENTATION

50.     The preceding paragraphs of the Complaint are hereby re-alleged as if fully set forth herein.

51.     When negotiating with Ms. Szebeni regarding her employment, Defendant Fairhaven acting individually or in the course of its business, profession and/or employment, and acting in a transaction in which it had a pecuniary interest, acted in such a manner and made promises and other representations so as to encourage Ms. Szebeni to change her situation and position, encouraging Ms. Szebeni to close her business in Palm Beach, Florida and to come to work for Defendant Fairhaven in Memphis, Tennessee.  Defendant Fairhaven supplied faulty information to Ms. Szebeni meant to guide her decision to leave Florida, close her business and accept employment with Defendant Fairhaven.

52.     Defendant Fairhaven failed to exercise reasonable care in obtaining and/or communicating the information provided to Ms. Szebeni which was meant to guide her decision to close her own business and accept employment with Defendant Fairhaven.

53. Ms. Szebeni justifiably relied on the faulty information she was provided by Defendant Fairhaven to her detriment, causing damages to Ms. Szebeni as a proximate cause thereof.

54. Ms. Szebeni prays for the following relief:

(a) For an award of compensatory damages against Defendant Fairhaven in an amount to be proven at trial, but in any event in excess of $1,000,000.

(b) For an award of attorneys' fees and costs expended herein and for such further relief as this Court deems just and equitable.

## COUNT IV
## PUNITIVE DAMAGES

55. The preceding paragraphs of the Complaint are hereby re-alleged as if fully set forth herein.

56. The conduct of the Defendants was, both at common law and/or statutorily, reckless, willful, knowing, grossly negligent, wanton and in such total disregard of the rights of Ms. Szebeni that an award of punitive damages is necessary to deter such conduct in the future.

57. As a result of the foregoing, in addition to compensatory damages, Ms. Szebeni is entitled to recover exemplary and punitive damages from Defendants.

WHEREFORE, Ms. Szebeni prays for the following relief:

(a) For an award of punitive damages in an amount to be proven at trial, but in any event, in excess of $1,000,000.

(b) For an award of attorneys' fees and costs expended herein and for such further relief as this Court deems just and equitable.

58. Plaintiff respectfully demands a jury trial.

Respectfully submitted,

/s/JAMES M. SIMPSON
JAMES M. SIMPSON, BPR 015023
ALLEN, SUMMERS, SIMPSON, LILLIE &
GRESHAM, PLLC
80 Monroe Avenue, Suite 650
Memphis, Tennessee 38120
Telephone: (901) 763-4200
Facsimile: (901) 684-1768
jsimpson@allensummers.com

ATTORNEYS FOR PLAINTIFF